ORIG

# EMPLOYMENT AGREEMENT

This Employment Agreement (this "**Agreement**") is entered into as of this 21st day of August, 2017 (the "**Effective Date**"), and is made by and between Nanocopoeia, LLC, a Minnesota limited liability company (the "**Company**") and James Schwier, a Florida resident (the "**Executive**").

## WITNESSETH:

WHEREAS, the Company wishes to employ the Executive as its Chief Operating Officer pursuant to the terms and conditions set forth in this Agreement; and

WHEREAS, the Executive wishes to accept such employment pursuant to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises, and of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

1. **Employment Period**. The Executive's employment with the Company will be governed by the terms and conditions contained herein. This Agreement is not a contract of employment for any specified length or term, and the Executive's employment with the Company will continue indefinitely until terminated in accordance with Section 4 hereof. Hereinafter, the period of the Executive's employment with the Company under this Agreement is referred to as the "**Employment Period**."

2. **Title and Reporting**. During the Employment Period, the Executive will be employed as the Chief Operating Officer of the Company and will report to Michael Graves, the Executive Chairman (the "**Executive Chairman**") of the Board of Directors of the Company (the "**Board**") or the Board itself.

3. **Work Schedule and Duties**. The Executive will serve the Company faithfully and to the best of his ability and will devote the Executive's full working time, attention and efforts to the Company. While employed by the Company, the Executive will not engage in other employment or other material business activity or serve on the board of directors of any other business entity without the approval of the Executive Chairman or the Board.

The Executive will have such duties, authority, and responsibilities as is consistent and customary with the duties normally performed by a chief operating officer. In addition, the Executive may perform such other duties in the nature of a senior executive as the Executive Chairman or Board shall reasonably determine from time to time.

4. **Compensation**.

(a) Base Salary. During the Employment Period, the Executive will receive an annual base salary of $400,000 (the "**Base Salary**"). The Base Salary will be payable in accordance with the Company's normal payroll practices as are in effect from time to time. During the term of this Agreement, the Company and the Executive agree to re-

evaluate the Executive's Base Salary on an annual basis to adjust the Base Salary upwards.

(b) Bonus. The Executive will be eligible for an annual bonus equal to thirty percent (30%) of his Base Salary based upon performance milestones determined by the Executive Chairman and/or the Board; provided, however, that no bonus shall be earned by or payable to the Executive during any calendar year in which the Company does not earn a net profit.

(c) Unit Grants. On the Effective Date, the Executive will be granted Thirty-Four Thousand Three Hundred Sixty-Four (34,364) Class D-2 Units of the Company (the "**Units**"), which represents approximately three percent (3%) of the issued and outstanding membership units of the Company. The Units will be granted pursuant to the form of Profits Interest Grant Agreement executed of even date herewith. Pursuant to the Profits Interest Grant Agreement, the Executive shall execute a Joinder to the Company's Amended and Restated Operating Agreement.

(d) Employee Benefits. During the Employment Period, the Executive will be entitled to participate in the employee benefit plans and programs made available by the Company to the executive employees of the Company to the extent that the Executive meets the eligibility requirements for each individual plan or program. The Company provides no assurance as to the adoption or continuation of any particular employee benefit plan or program; provided, however, during the Employment Period, the Company will provide the Executive and his immediate family with health and dental benefits. The Executive will be entitled to four (4) weeks of paid time off in addition to the holidays currently recognized by the Company.

(e) Reimbursement for Business Expenses. The Company will reimburse the Executive for all reasonable out-of-pocket business expenses incurred by the Executive on behalf of the Company, such reimbursement to be made promptly in accordance with the standard policies of the Company relating to reimbursement of business expenses. The Company will reimburse the Executive for all reasonable expenses incurred by the Executive for traveling to and residing in the Minneapolis-St. Paul metropolitan area, such reimbursement to be made promptly in accordance with the standard policies of the Company relating to reimbursement of business expenses. A copy of the current version of the Company's expense reimbursement policy is attached hereto as Schedule A.

(f) Withholdings. All payments made under this Section 4, or under any other provision of this Agreement, will be subject to applicable payroll withholdings for state and federal income taxes, FICA, and other applicable payroll deductions that the Company reasonably determines are required by law or as elected by the Executive.

5. **Termination**. This Agreement may be terminated as set forth below:

(a) By the Company or the Executive, with or without "Cause" (as hereinafter defined), for any reason or without reason, upon thirty (30) days' written notice to the other party.



EXHIBIT A-2

(b) By the Company upon written notice to the Executive for "Cause" as defined in and subject to such notice and cure periods as set forth in Section 7.

(c) By the Executive upon written notice to the Company for "Good Reason" as defined in and subject to such notice and cure periods as set forth in Section 8.

(d) Upon death or disability of the Executive. For the purpose of this Agreement, the disability of the Executive shall occur when by reason of physical and/or mental injury or illness, the Executive shall be unable to perform the duties of the position he then occupies with reasonable accommodation for a period of six consecutive months or periods of time aggregating nine months in any twelve-month period, as reasonably determined by the Board.

6. **Severance Pay Entitlement**. If the Executive's employment with the Company is terminated by the Company without Cause, or if the Executive terminates his employment with the Company for "Good Reason," then the Executive shall be entitled to the following severance payments and benefits, subject to Executive executing and delivering to the Company a "Separation Agreement" containing a "Release" of legal claims in such form and content as the Company will provide:

(a) Subject to the provisions in subparagraph (b) below, (i) continuation of Executive's annualized Base Salary at the time of such termination as "Severance "Pay" for a period commencing upon the termination of Executive's employment with the Company and continuing for twenty-four (24) months from the date of such termination; (ii) payment of Executive's accrued and unused vacation as of the date of termination; and (iii) payment of the portion of the premiums paid by the Company prior to termination to continue Executive's coverage under the Company's health insurance program for the period from the termination of such employment until the earlier to occur of (y) twenty-four (24) months thereafter, or (z) Executive becoming eligible for health insurance provided by a subsequent employer. Payment of the Severance Pay will be in up to 24 "Monthly Installment(s)" on the first Company payday in each calendar month, starting on the payday after the Company receives the Separation Agreement signed and dated by Executive and upon expiration of applicable periods of time for Executive to revoke the Separation Agreement and rescind any waivers of claims in the Release.

(b) As a further condition of each Monthly Installment of Severance Pay, Executive shall first represent to the Company that Executive has made a good faith effort to obtain an offer of a position as an employee, consultant, or in any other capacity that is commensurate with Executive's skills, qualifications, and career pay. Each Monthly Installment of Severance Pay will be reduced by the amount of base salary that Executive receives or is entitled to receive in that month from any other person or entity for rendering services as an employee, consultant, or in any other capacity. Executive shall be required to provide to the Company from time to time written notice of the amount earned by Executive each month which would reduce the Severance Pay.

7. **Cause**. "Cause" means (i) the theft or embezzlement by the Executive of property of the Company; (ii) the commission by the Executive of any willful act of malfeasance or fraud against the Company that has an adverse effect on the business of the Company; (iii) the material breach by the Executive of any agreement with the Company, including the continuing failure or refusal of the Executive to perform the Executive's material and substantial duties for the Company as directed by the Executive Chairman or Board; (iv) the Executive's conviction of any felony; (v) material violation by the Executive of any Company policy that has a material adverse effect on the Company; or (vi) the material breach by the Executive of the Confidentiality Agreement (as hereinafter defined) or any other written confidentiality or non-solicitation agreement between the Executive and the Company; provided, that if the act or acts constituting Cause are susceptible of cure, then the Company will provide the Executive with written notice setting forth the act or acts constituting Cause and providing that the Executive may cure such act or acts within thirty (30) business days of receipt of that notice, and if so cured the Executive's employment may not be terminated by the Company with Cause.

8. **Good Reason**. "Good Reason" means (i) any material diminution in the Executive's responsibilities, duties or authority as Chief Operating Officer of the Company; (ii) requirement to relocate the Executive's residence, without his consent, to a location that is more than 60 miles from his then-current residence; or (iii) any material breach by the Company of any obligation under this Agreement or any other written agreement between the Company and the Executive; provided, that if the act or acts constituting Good Reason are susceptible of cure, then the Executive will provide the Company with written notice setting forth the act or acts constituting Good Reason and providing that the Company may cure such act or acts within thirty (30) business days of receipt of that notice, and if so cured the Executive's employment may not be terminated by the Executive with Good Reason.

9. **Confidentiality of Proprietary Information**. Contemporaneously with the execution of this Agreement, the Executive has executed the Company's Employee Confidentiality and Assignment of Inventions Agreement ("**Confidentiality Agreement**").

10. **Indemnification; Insurance**. The Company will defend, indemnify, and hold harmless the Executive to the maximum extent permitted under the laws of the State of Minnesota, specifically Chapter 322C of the Minnesota Statutes. Further, the Company will cover the Executive, at its sole expense, under any and all directors and officers liability insurance policies carried by it, both during the Employment Period and, while potential liability exists, after the Employment Period. Such post-employment coverage shall be no less favorable than the most favorable policy covering active directors and senior officers of the Company from time to time.

11. **Notices**. All notices and other communications provided for in this Agreement will be in writing and will be deemed to have been duly given when delivered and received by the other party, or one day after sending when sent by recognized overnight courier service to the following addresses:

If to the Company:

Nanocopoeia, LLC
1246 West University Avenue, Suite 463
St. Paul, MN 55104
ATTENTION: Michael Graves

with a copy to:
Maslon LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
ATTENTION: Joseph Alexander

If to the Executive:

James Schwier
4501 W. Tradewinds Avenue
Lauderdale By The Sea, FL 33308

or to such other address as either party hereto will have furnished to the other in writing in accordance with this Section 12, except that such notice of change of address shall be effective only upon receipt. Rejection or other refusal to accept will be deemed to be receipt of the notice or other communication sent.

12. **Severability**. In the event that any of the provisions of this Agreement, or the application of any such provisions to the Executive or the Company with respect to obligations hereunder, is held to be unlawful or unenforceable by any court, then the remaining portions of this Agreement will remain in full force and effect and will not be invalidated or impaired in any manner.

13. **Entire Agreement; Amendments; Construction; Section 409A.**

(a) This Agreement contains the entire agreement between the Executive and the Company with respect to the subject matter of this Agreement, and supersedes any other prior agreements and understandings, oral or written, between the Executive and the Company with respect to the subject matter of this Agreement.

(b) This Agreement may be amended only by an agreement in writing signed by the Executive and an authorized representative of the Company (other than the Executive).

(c) The headings and captions of this Agreement are provided for convenience only and are intended to have no effect in construing or interpreting this Agreement. The language in all parts of this Agreement will be in all cases construed according to its fair meaning and not strictly for or against the Company or the Executive. The use herein of the word "including," when following any general provision, sentence,

clause, statement, term, or matter, will be deemed to mean "including, without limitation." As used herein, the words "day" or "days" will mean a calendar day or days unless otherwise indicated. Neither any course of dealing nor any failure or neglect of either party hereto in any instance to exercise any right, power, or privilege hereunder or under law will constitute a waiver of any other right, power, or privilege or of the same right, power, or privilege in any other instance. All waivers by either party hereto must be contained in a written instrument signed by the waiving party and, in the case of the Company, by its duly authorized officer.

(d) The payments and benefits under this Agreement are intended, to the maximum extent possible, to be exempt from the requirements of Section 409A of the Internal Revenue Code and the regulations thereunder ("**Section 409A**"). Otherwise, such payments and benefits are intended to be compliant with the requirements of Section 409A. To the extent that any payment or benefit under this Agreement is subject to the requirements of Section 409A, then, with respect to such payment or benefit, this Agreement will be interpreted in a manner to comply with the requirements of Section 409A. Further, payments or benefits under this Agreement that are subject to the requirements of Section 409A may only be provided upon an event and in a manner that complies with Section 409A, and any such payment or benefit that is to be made upon or as a result of a termination of employment shall only be made if such termination of employment constitutes a "separation from service" (as defined under Section 409A). Notwithstanding anything in this Agreement to the contrary, in the event that amendments to this Agreement are necessary in order to continue to comply with future guidance or interpretations under Section 409A, including amendments necessary to ensure that compensation will not be subject to tax under Section 409A, the Company and the Executive agree to negotiate in good faith the applicable terms of such amendments and to implement such negotiated amendments, on a prospective and/or retroactive basis, as needed.

(e) To the extent that (i) any payment or benefit under this Agreement constitutes a payment or benefit under a "nonqualified deferred compensation plan" (as defined in Section 409A) that is not exempt from the requirements of Section 409A; (ii) such payment or benefit is payable or to be provided as a result of a "separation from service" (as defined in Section 409A); (iii) the Company is or is deemed to be publicly traded pursuant to Section 409A at the time of such separation from service; and (iv) the Executive is a "specified employee" (as defined in Section 409A) on his separation from service date, then, notwithstanding any other provision in this Agreement to the contrary, such payment or benefit will not be made or provided to the Executive before the earlier of (I) the day after the date that is six (6) months following the Executive's separation from service as defined under Section 409A, or (II) the Executive's death.

14. **Mediation**. The parties will, to the greatest extent possible, endeavor to resolve any disputes relating to this Agreement by negotiation. If a dispute arises out of or relates to this Agreement or the breach thereof, and if the dispute cannot be settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation before resorting to litigation or some other dispute resolution procedure.

15. **Governing Law; Venue.** This Agreement will be governed by and construed in accordance with the internal laws of the State of Minnesota, without regard to principles of the conflict of laws thereof. Any disputes arising out of this Agreement shall be determined in the Hennepin County District Court, Minneapolis, Minnesota or the U.S. District Court for the District of Minnesota.

16. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which so executed will be deemed to be an original, and such counterparts will together constitute but one agreement. Signatures delivered by means of electronic transmission shall be valid and binding to the same extent as the delivery of original signatures.

17. **Voluntary Agreement.** The Executive enters into this Agreement voluntarily after having had the opportunity to consult with advisors of his choice.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**NANOCOPOEIA, LLC**

By: ______________________
Michael Graves
Executive Chairman

**JAMES SCHWIER**

______________________
James Schwier