ORIG

**NANOCOPOEIA, LLC**
**PROFITS INTEREST GRANT AGREEMENT**
**(EMPLOYEE)**

THIS UNIT GRANT AGREEMENT (this "**Agreement**") is made effective as of August 21, 2017, by and between Nanocopoeia, LLC, a Minnesota limited liability company (the "**Company**"), and James Schwier, a resident of the State of Florida ("**Grantee**"). Grantee is an employee of the Company, and has entered into an Employment Agreement with the Company as of the date hereof (the "**Employment Agreement**"), and the Company desires to induce Grantee to serve the Company through the grant of certain membership interests representing the right to share in future profits of the Company.

NOW, THEREFORE, the parties hereto agree as follows:

1. Grant of Non-Vested Units. The Company hereby grants to Grantee an aggregate of Thirty-Four Thousand Three Hundred Sixty-Four (34,364) Class D-2 Units of the Company (the "**Units**"). The Units granted under this Agreement, and the rights and obligations thereunder, are defined in the Amended and Restated Operating Agreement of the Company dated February 24, 2017, as amended from time to time (as amended, the "**Operating Agreement**") of the Company, and are further subject to the terms and conditions herein. The capital account attributable to the Units as of the date hereof shall be zero. The D-2 Grant Date Value as defined in the Operating Agreement is $1.00 per Class D-2 Unit.

2. Vesting of Units. The Units granted under Section 1 shall vest as follows:

(a) 25% on the effective date of this Agreement.

(b) 25% on the first anniversary of this Agreement.

(c) 25% on the second anniversary of this Agreement.

(d) 25% on the third anniversary of this Agreement.

Vesting of the Units, if not previously vested, shall be accelerated upon a Change of Control (as hereinafter defined).

3. Change of Control.

(a) Change of Control. For purposes of this Section 3, a "**Change of Control**" of the Company will mean the following:

(i) the sale, lease, exchange or other transfer, directly or indirectly, of substantially all of the assets of the Company (in one transaction or in a series of related transactions) to a person or entity that is not controlled by the Company;

(ii) any person becomes after the effective date of this Agreement the "beneficial owner" (as defined in Rule 13d-3 under the Securities and Exchange Act of 1934, as amended (the "**Exchange Act**")), directly or indirectly, of 50% or

more of the combined voting power of the Company's outstanding equity securities ordinarily having the right to vote in matters submitted to a vote of the Company's voting members;

(iii) a merger or consolidation to which the Company is a party if the Company's members immediately prior to effective date of such merger or consolidation have "beneficial ownership" (as defined in Rule 13d-3 of the Exchange Act), immediately following the effective date of such merger or consolidation, of securities of the surviving entity representing less than 50% of the combined voting power of the surviving entity's then-outstanding securities ordinarily having the right to vote in matters submitted to a vote of the owners of such entity; or

(iv) notwithstanding the foregoing, any transaction that is fundamentally a financing transaction, as determined in good faith by the Board, shall not be deemed a Change of Control for the purposes of this Agreement.

4. Rights of Grantee. Grantee, as holder of the Units, shall have the rights of a member of the Company holding D-2 Units with respect to the vested and non-vested Units. The Company shall in its books and records promptly record the Grantee as owner of the Units. The Company shall not be obligated to deliver any certificate representing Units granted hereunder.

5. Forfeiture. If at any time during the term of this Agreement, Grantee ceases to be an employee of the Company, for any reason or no reason, before a Change in Control, all non-vested Units shall be forfeited; provided, however, that if Grantee's employment is terminated by the Company without "Cause" as defined in the Employment Agreement or if Grantee terminates his employment with the Company for "Good Reason" as defined in the Employment Agreement on a date that is not an anniversary date of this Agreement, then the installment of Units that would have vested on the next anniversary of this Agreement will be considered fully vested for the purposes of this Paragraph 5. In the event of forfeiture under this Section 5, all income attributable to the non-vested Units previously allocated to the Grantee during the taxable year in which the forfeiture occurs shall be reallocated among the other Members of the Company.

6. Company's Repurchase Option.

(a) If at any time during the term of this Agreement, any of the events described in Sections 6(a)(i) or 6(a)(ii) occurs, the Company shall have the option to repurchase any or all vested Units granted hereunder, as provided in this Section 6 ("**Repurchase Option**").

(i) Grantee ceases to be an employee of the Company for no reason or for any reason, except for Cause as set forth in Section 6(a)(ii) of this Agreement.

(ii) Grantee's employment with the Company is terminated by the Company for "Cause" as defined in the Employment Agreement.

(b) The Company shall exercise the Repurchase Option no later than 180 days after the Grantee ceases to be an employee of the Company. The Company shall provide

written notice to the Grantee of the Company's intention to exercise the Repurchase Option setting forth a date for closing not later than 30 days from the mailing of such notice. If the Company does not elect to exercise the Repurchase Option by giving the requisite notice within 180 after the Grantee ceases to be an employee of the Company, the Repurchase Option shall terminate.

(c) If the Repurchase Option is triggered by a termination of employment without Cause, the purchase price shall be the "Fair Market Value" of the Units (as hereinafter defined). If the Repurchase Option is triggered by a termination for Cause, the purchase price shall be the aggregate value of the capital account of the Units purchased by the Company.

(d) The Fair Market Value of the Units shall be determined by appraisal as of the calendar month-end preceding the date of termination of employment, unless otherwise explicitly agreed in a written agreement signed by both the Company and the Grantee. In this regard, one independent appraiser that is experienced in the valuation of businesses engaged in the Company's business mutually selected by the Company and the Grantee shall make a determination of fair market value of the Units according to the valuation standard set forth in Section 6(e) below. The appraisal costs shall be paid by the Company. If the Company and the Grantee cannot agree upon an independent appraiser, each shall appoint one independent appraiser, and the two appraisers so appointed shall, within ten days thereafter, appoint a third independent appraiser who is experienced in the valuation of businesses in the Company's business, who shall conduct the appraisal. The appraiser's determination of the value of the Units shall be final and binding absent manifest errors in the underlying data or assumptions used by the appraiser, in which case an aggrieved party may within ten days require the appraiser to recondition the results of the appraisal by written notice of such demand delivered to the appraiser and the other party or parties to the transaction.

(e) The Fair Market Value of the Units hereunder shall be the cash price that would be payable to a reasonable seller by a reasonable third party buyer for such Units (both having full knowledge of all material facts), with due consideration given to the terms and conditions of this Agreement and all other facts and circumstances, including the application of appropriate premiums and discounts for control, lack of control and lack of marketability.

(f) The closing of any purchase and sale hereunder shall occur on a reasonable date, at a reasonable place and at a reasonable time to be selected by the Company, which shall be no later than 30 days after a final determination of Fair Market Value pursuant to Section 6(d). At such closing, the Grantee shall deliver an executed instrument conveying title to the Units in form and substance satisfactory to the Company, and the Company shall deliver the initial installment of the purchase price.

(g) In connection with its Repurchase Option exercised pursuant to this Section 6, the Company shall be obligated to pay to the Grantee at least 10% of the purchase price in cash at closing. Upon delivery of the cash payment at closing, the Units shall be assigned to the Company with all necessary instruments reasonably required to

complete such transfer on the Company's books and records. Notwithstanding the foregoing, the Company may offset the purchase price hereunder by any and all amounts due to the Company and amounts owed for damages, and such offset may be used first to reduce cash amounts due at closing.

(h) In connection with its Purchase Option, if paying less than the entire purchase price in cash, the Company shall execute an unsecured promissory note in customary form for the remaining balance of the purchase price. Any such promissory note shall have a maximum term of five years and bear interest at the applicable federal rate immediately prior to the closing date and shall provide for prepayment without penalty. The promissory note shall provide that the Company shall not be obligated to make payments on such note and any similar notes arising from the purchase of Units then outstanding or later issued exceeding an aggregate of 10% of "Net Cash From Operations" (as defined in the Operating Agreement) for any fiscal year (prior to taking into account such payments); if all or any portion of a payment to be made would exceed the foregoing limitation, then such obligation will be carried over into the next fiscal year with a corresponding extension in the term of the promissory note.

(i) To the extent the provisions of this Section 6 conflict with the repurchase provisions contained in the Operating Agreement, the provisions of this Agreement shall control.

7. Restrictions on Transfer of Units. The Units granted hereunder, whether vested or non-vested, shall not be transferable otherwise than by will or the laws of descent and distribution, subject to the options and rights of (i) the Company in Section 6 hereof, and (ii) the Company and its Members pursuant to the Operating Agreement. More particularly, but without limiting the generality of the foregoing, the Units may not be assigned, transferred, pledged or hypothecated in any way, shall not be assignable by operation of law, and shall not be subject to execution, attachment or similar process. Any attempted assignment, transfer, pledge, hypothecation or other disposition of the Units contrary to the provisions hereof, and the levy of any execution, attachment, or similar process upon the Units, shall be null and void and without effect.

8. Operating Agreement. In addition to the other terms and conditions set forth herein, the Grantee agrees to execute the current Operating Agreement, any subsequent amendment, and any member control, operating, investor rights, voting or similar agreements (any such agreement, a "**Member Agreement**") by which the holders of a majority of the then-outstanding membership interests (the "**Majority Members**") agree to be bound; provided, however, Grantee shall not be required to execute any Member Agreement that materially adversely affects the Financial Rights of the Grantee as defined in the Operating Agreement. In the event the Grantee fails or refuses to agree to be bound by such an agreement, then a representative of the Majority Members, or any of them, may execute any Member Agreement on behalf and in the name of the Grantee, and for such purpose each of them is hereby appointed the attorney-in-fact of the Grantee for the purpose of effectuating the requirements of this Section 9.

9. Anti-Dilution Rights. The number of Units granted hereby represents approximately three percent (3%) of the outstanding membership interests of the Company. If at the time that Grantee ceases to be an employee of the Company the number of Units granted hereby no longer represents three percent (3%) of the then outstanding membership interests of the Company because of additional membership interests issued to Frauenshuh and Frauenshuh Associates (as defined in the Operating Agreement), then the Units granted hereby shall be expressed as the number of Units granted hereby plus the number of additional Units required to compensate Grantee for the dilution of his granted Units solely as a result of the issuance of additional Units to Frauenshuh and/or Frauenshuh Associates. After Grantee ceases to be an employee, his Units granted hereby shall not be further adjusted for dilution as a result of issuance of membership interests to Frauenshuh or Frauenshuh Associates.

10. No Market for Units. Grantee acknowledges that there is presently no market for the sale or re-sale of the Company's securities, including the Units granted hereunder, and that this Agreement does not create any obligation on the part of the Company to provide or create a market to sell the Units. The Company makes no representation or warranty as to whether a market will develop or be available for the Units at any time.

11. Investment Representation. By acceptance hereof, Grantee represents and warrants to the Company that all Units acquired pursuant to this Agreement shall be: (a) for Grantee's own account; and (b) for investment purposes only and not with a view to distribution of such Units. Grantee further represents and warrants to the Company that Grantee has made no agreement or commitment, and has no understanding, with any other person regarding the Units or any transfer or disposition thereof.

12. Lock-Up Agreement. Grantee agrees that upon receipt of a written request by the Company or by its underwriters, Grantee shall not sell, hypothecate, contract to sell, grant any option to purchase, pledge or otherwise dispose of the Units (or any securities issued in exchange therefor) for a period of 180 days after the date of consummation of an initial public offering of the Company's securities. Grantee also agrees and consents to the entry of stop-transfer instructions with the Company's transfer agent and registrar against the transfer of such Units except in compliance with the foregoing restrictions. This covenant is irrevocable and will be binding on Grantee and Grantee's successors, heirs, personal representatives and assigns.

13. Tax Consequences. Grantee agrees that Grantee is solely responsible for his or her tax liability that may arise as a result of the grant of Units hereunder, has consulted with his or her own tax advisors regarding the federal, state and local tax consequences of this Agreement and his or her receipt of the grant, and is not relying on any statement or representation of the Company or its employees, representatives or agents, specifically including but not limited to the Company's legal counsel. To the extent that the receipt of the Units or the vesting of any such Units in accordance with Section 2 above results in income to Grantee for federal or state income tax purposes, Grantee shall deliver to the Company at the time of such receipt or lapse, as the case may be, such amount of money as the Company may require to meet its withholding obligations, if any, under applicable tax laws or regulations.

14. Compliance with Code Section 409A. This Agreement shall be interpreted and administered in a manner intended to be exempt from or comply with Section 409A of the Internal Revenue Code of 1986, as amended, and any treasury regulations issued thereunder.

15. Restrictive Covenants. The Grantee understands that, in connection with the Grantee's service as an employee of the Company, the Company has required or, will require, the Grantee to enter into the Company's form of Employee Confidentiality and Assignment of Inventions Agreement (the "**Confidentiality Agreement**"), and that the Units issued hereby represents consideration for Confidentiality Agreement.

16. No Right to Continued Employment. This Agreement shall not confer upon Grantee, and shall not be construed to confer upon Grantee, any right to continue to serve as an employee of the Company or any company owned or controlled by the Company or a successor-in-interest to the Company, for any period of time, and shall not limit the rights of the Company or its board of directors or members to terminate the employment of Grantee, in compliance with applicable law, at any time, with or without cause, for any reason or no reason.

17. Notices. Any and all notices provided for in this Agreement shall be in writing and sent, by prepaid registered or certified mail or by recognized overnight courier service, to the respective party's address, as set forth on the signature page to this Agreement. Any party hereto may change its address by notice to the other parties given as set forth above. Any notice and any payment due hereunder shall be deemed given or made, as the case may be, when mailed as set forth above.

18. General Provisions. This Agreement, in its interpretation and effect, shall be governed by the laws of the State of Minnesota applicable to contracts executed and to be performed therein, without regard to such state's laws concerning conflicts of laws. Any disputes arising out of this Agreement shall be determined in the Hennepin County District Court or the United States District Court, District of Minnesota. This Agreement supersedes any and all prior agreements, understandings, negotiations and discussions, whether written or oral, of the parties related to the subject matter hereof, including specifically (but not limited to) any provision or agreement containing or providing terms and conditions upon which Grantee may or shall be entitled to acquire voting or non-voting securities of the Company under an equity plan or otherwise. Any term or condition of this Agreement may be waived at any time by the party entitled to the benefit thereof, and any such waiver must be pursuant to written waiver signed by the party entitled to such benefits. No waiver of any of the provisions of this Agreement shall be deemed to or shall constitute a waiver of any other provision hereof. No delay or failure on the part of any party hereto to exercise any right, power or privilege hereunder shall operate as a waiver thereof; nor shall any waiver on the part of any party hereto of any right, power or privilege hereunder operate as a waiver of any other right, power or privilege hereunder; nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder. Nothing herein expressed or implied is intended to or shall be construed as conferring upon or giving to any person, firm or corporation other than the parties hereto any rights or benefits under or by reason of this Agreement. Each party hereto agrees to execute such further papers, agreements, assignments or documents of title as may necessary or desirable to effect the purposes of this Agreement and carry out its provisions. This Agreement may be executed in any

number of counterparts, each of which shall be deemed an original, but all of which shall be constitute but one in the same agreement. Signatures delivered by means of electronic transmission shall be valid and binding to the same extent as delivery of original signatures.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, the parties have executed this Profits Interest Grant Agreement effective as of the date set forth above.

COMPANY:

NANOCOPOEIA, LLC

By: ______________________________
Michael Graves, Executive Chairman

Address for Notice:
Nanocopoeia, LLC
1246 West University Avenue, Suite 301
St. Paul, MN 55104
Attention: Michael Graves

GRANTEE:

______________________________
James Schwier

Address for Notice:
James Schwier
4501 W. Tradewinds Avenue
Lauderdale By The Sea, FL 33308